# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James J. Benincasa, Jody L. Benincasa,                    Civil No. 10-CV-959 (SRN/TNL)
James J. Benincasa and Jody L.
Benincasa as participants in Mortgages
Unlimited, Inc.'s Benistar 419 Plan and
Trust,

        Plaintiffs,

v.                                                        MEMORANDUM OPINION
                                AND ORDER

The Lafayette Life Insurance Company,
an Indiana corporation,

        Defendant.

_____

Mark Kallenbach, 2260 Ridge Drive, Suite 13, Minneapolis, Minnesota 55416, for Plaintiffs

Justice Ericson Lindell, David P. Pearson and Joseph M. Windler, Winthrop & Weinstine, P.A., 225 South Sixth Street, Suite 2500, Minneapolis, Minnesota 55402, for Defendant
_____

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Defendant's Motions for Partial Summary Judgment

[Doc. Nos. 54 & 74].  For the reasons that follow, Defendant's Motions are granted.

## I.     BACKGROUND

      Plaintiffs James and Jody Benincasa, husband and wife, are participants in Mortgages

Unlimited, Inc.'s Benistar 419 Plan and Trust.  From 1991-2006, the Benincasas were the

owners of Mortgages Unlimited, Inc. ("MUI"), a Minnesota-based mortgage brokerage

company.  (James Benincasa Dep., Benincasa v. Myslajek at 10, Ex. A to First Decl. of Justice

Ericson Lindell; James Benincasa Dep. at 12-13; 57, Ex. B to First Decl. of Justice Ericson

Lindell.)  The Plaintiffs' company was successful, exceeding $3 billion in gross sales over an extended period, leading to the opening of a second location in Florida.  (James Benincasa Dep. at 13; 30, Ex. B to First Lindell Decl.)  From 2000-2006, Mr. Benincasa earned over $1 million a year.  (Id. at 51-52.)   During this time period, the Benincasas worked with their insurance broker, Dave Procia, to handle the Benincasas' personal and business insurance needs, and had worked with private financial planners since the late 1990s to manage their investments.  (Id.. at 16; 60-61.)   Starting in the late 1990s, the Benincasas began purchasing whole life insurance products, which they understood to have a cash and investment component that accrued over time.  (Id. at 61-62.)  They also held numerous term life insurance policies.  (Id. at 80-81.)

At some point in 2001, James Benincasa consulted with an investment advisor about investing additional money for retirement.  (Id. at 89-90.)   Mr. Procia introduced Mr. Benincasa to a life insurance agent, with whom Mr. Benincasa and his stockbroker met.  (Id. at 90.)  The agent recommended the purchase of a whole life insurance policy with a "split dollar"/investment component to allow later withdrawals against the cash value of the policy. (Id. at 91.)  Interested in this possible investment, Mr. Benincasa then met with Tim Myslajek, a tax consultant with whom he consulted on his personal behalf and on behalf of MUI.  (Id. at 95.) Benincasa testified that he wanted Myslajek's advice about whether investing in whole life insurance was a "stupid thing or a good thing to do."  (Id.)  Myslajek recommended that Benincasa consider the Benistar 419 Plan ("the Plan").  (Id. at 97.)  The Benistar 419 Plan was a welfare plan designed and administered by Benistar and its founder, Daniel Carpenter, purportedly to allow closely-held companies to fund whole life insurance policies on the lives of a few key employees.  Purportedly, under the terms of the Plan,  the contributions and future

deductions would be tax-free.  (Id. at 99-100.)

Based on Myslajek's recommendation, the Benincasas then met with Myslajek and Michael Antonello, an independent insurance broker and representative of Wealth Management Advisors ("WMA").  (Id. 100-101.)   The Benincasas contend that Antonello explained that the Plan would be funded with whole life insurance products, but that the premiums would be higher than Plaintiffs anticipated.  (Id. at 99.)  According to Antonello, MUI would fund the Plan on a pre-tax basis and the Plan would purchase two whole life insurance policies, insuring the lives of Plaintiffs.  (Id. at 99; 105; 205.)  Mr. Benincasa testified that Antonello advised him that in the future, the accumulated value of the polices could be withdrawn on a tax-free basis to fund Plaintiffs' retirement.  (Id. at 104.)  Antonello furnished the Benincasas with various financial projections, including a faxed illustration claiming that Plaintiffs' tax deductible contributions would generate $191,288 of tax-free income lasting 46 years, totaling $8,799,248.  (First Am. Compl. ¶ 22 [Doc. No. 45].)  The projection further stated, "If you are willing to wait 3 more years before making tax-free withdrawals, you would increase your annual income to $260,747 and for 43 years this would be an astonishing $11,212,121."  (Id.)

After the meeting with Antonello, Plaintiffs discussed the Plan with Myslajek and with their personal tax attorneys at Larkin, Hoffman, Daly & Lindgren, Ltd. ("Larkin Hoffman"). (James Benincasa Dep. at 164, Ex. B to First Lindell Decl.)  The Benincasas asked Larkin Hoffman and Myslajek to review all of the materials provided by Benistar and Antonello to verify the accuracy and legitimacy of any tax deductions.  (Id. at 175-76; 228.)  Mr. Benincasa testified that he relied on Larkin Hoffman to look at the Plan on his behalf.  (James Benincasa Myslajek Dep. at 62-63, Ex. A to First Lindell Decl.)  He further testified that he sought Larkin

Hoffman's assurance as to the size of the policies and the Plan's compliance with the tax code. (James Benincasa Dep. at 175-76, Ex. B to First Lindell Decl.)  Antonello offered to provide Mr. Benincasa with a legal opinion from the law firm of Edwards & Angel, discussing the legalities of the Plan's tax deductions, but Mr. Benincasa declined and instead asked that Antonello send any such information to Larkin Hoffman.  (Id. at 164-66; 167; 227-28.)   Attorneys at Larkin Hoffman advised Mr. Benincasa that they were comfortable with the Plan.  (James Benincasa Myslajek Dep. at 71, Ex. A to First Lindell Decl.)  Mr. Benincasa testified that he relied upon their opinion in deciding to make a contribution to the Plan.  (Id. at 68-69.)  In addition, he testified that Myslajek's confidence in the Plan led him to believe it was both suitable and tax-compliant.  (James Benincasa Dep. at 157; 165-66, Ex. B to First Lindell Decl.)

Ultimately, MUI (via the Benincasas) participated in the Plan.  On November 30, 2001, Plaintiffs executed the documents relating to their participation, including applications for insurance from Lafayette Life, the carrier providing the whole life insurance policies.  (James Benincasa Application & Jody Benincasa Application, Exs. C & D to Decl. of Larry Silverstein.) Plaintiffs applied for $36 million in life insurance coverage.  Defendant's underwriter did not approve that amount and instead approved up to $33 million in coverage.  (Id.)  The Benincasas funded their participation with two $16 million Lafayette Life whole life insurance policies. (Jody Benincasa Policy & James Benincasa Policy, Exs. I & J to First Lindell Decl.)

Pursuant to issuance of the policies, Lafayette Life, the carrier, made certain written disclaimers.  For instance, it provided that it was not endorsing the Plan as an investment strategy, rather it simply provided:

> In issuing its policies, [Lafayette Life] represents and warrants only those
> promises contained within the insurance contract itself, and no other. [Lafayette

> Life's] agreement to issue insurance policies to the Plan does not constitute an endorsement of the Plan.

(Disclosure & Acknowledgment Stmt., Ex. E to First Lindell Decl.)  In addition, Lafayette Life

disclaimed responsibility for any tax consequences resulting from issuance of the policies:

> By accepting applications from the Plan Administrator of the Plan or by agreeing to issue any policy to the Plan, [Lafayette Life] makes no representations to [MUI] or to any of its employees or representatives concerning the federal and state tax consequences of participating in the Plan.  No director, officer, employee, agent, General Agent, or other person has authority on behalf of [Lafayette Life] to provide the Plan, [MUI], or any of [MUI's] employees with any legal or tax advice concerning participation in the Plan, or the termination of participation in the Plan.

> In particular, [Lafayette Life] makes no representations regarding the following issues:

> > 1.  Whether or not [MUI] will be allowed a current income tax deduction for amounts contributed to the Plan.

> > 2.  Whether or not an income tax deduction allowed in any taxable year may again be allowed in any subsequent taxable year for any reason.

> > 3.  Whether [MUI] will recognize any income or gain from participation in the Plan or from the termination of participation in the Plan.

> > 4.  Whether any transaction might constitute a reversion of Plan assets to the Employer.

> > 5.  What amount is includible as an employee's gross income, or in his wages for Social Security and Medicare tax purposes, as a result of participation in the Plan.

(Id.)  In signing the Disclosure & Acknowledgment Statement, the Benincasas acknowledged

their reliance on their own attorneys and advisors, that there was no guarantee that the Plan

would grow in value and that only the Benincasas would be responsible for any tax

consequences:

1.  In determining whether to adopt the [419] Plan and to what extent [the Benincasas] would participate, they have sought and relied on legal and tax advice from their own independent advisors.

2. [MUI and the Benincasas] are responsible for the tax consequences resulting from adoption and/or participation in the Plan.

3.  Neither [Lafayette Life] nor any of its directors, officers, employees, agents, General Agents or other representatives have offered or have the authority to offer any legal or tax advice concerning the adoption and/or participation in the [419] Plan.

. . .

5. [Lafayette Life] will be responsible solely for the promises contained in its insurance contracts.

6. Any illustrations provided in connection with the sale of [Lafayette Life's] policy do not constitute a guarantee or warranty of the policy's value, nor are such illustrations either estimates or projections of the policy's future performance or dividend scale.

Id.

The Benincasas and MUI also executed Acknowledgment and Hold Harmless Agreements ("the Releases"), acknowledging that Lafayette Life served only in the capacity of a provider of insurance and not as the underwriter of benefits conferred by the Plan.  (Releases, Exs. A & B to Silverstein Decl.)  The Releases also advised Plaintiffs to obtain legal advice prior to participating in the Plan, which Plaintiffs acknowledged:

We understand that we are strongly advised to secure advice and counsel from our own legal and/or tax counsel (our attorney or accountant) as to participation in the [Welfare Benefit Trust] or [Voluntary Employees' Beneficiary Association] and the tax consequences of such participation.

(Id.)

Further, in the Releases, Plaintiffs agreed to hold Lafayette Life harmless "as to any and all consequences of our participation in a [Welfare Benefit Trust] or [Voluntary Employees'

6

Benefit Association], including but not limited to any tax consequences," and further agreed not to seek contribution or reimbursement from Defendant for any loss "directly or indirectly arising out of, or in any way related to the existence or administration of the [Welfare Benefit Trust] or [Voluntary Employees' Benefit Association], and its purchase of life insurance."  (Id.)

In December 2001, MUI contributed $700,000 in annual payments to Benistar on behalf of the Benincasas.  (First Am. Compl. ¶¶ 33-35.)  These payments to Benistar were made each year through 2004, for a total of $2.8 million in premium payments.  Benistar, as the owner of the policy, then made the annual premium payments to Lafayette Life.  In 2003, the Benincasas apparently terminated their participation in the Plan and directly purchased the policies from Benistar.  The Internal Revenue Service ("IRS") subsequently determined that the Plan constituted an unlawful tax shelter.  Because it found that the Benincasas failed to report a taxable gain for years 2003 and 2004, the IRS assessed interest and penalties against them. (See First Am. Compl. ¶ 50; Letter of 1/13/10 from D. Shulman to Benincasas, Ex. N to First Lindell Decl.)

In 2006, Plaintiffs contend that Lafayette Life presented revised projections depicting the depletion of their life insurance policies within ten years, based on an annual withdrawal rate of $160,000.  (First Am. Compl. ¶ 44.)  Plaintiffs contend that this differed significantly from the original representation of $191,288 of tax-free annual income for a 46-year period.  (Id.)

In March 2010, Plaintiffs commenced litigation against Defendant Lafayette Life in Hennepin County District Court.[1]  Defendant removed the case to this Court on March 25, 2010.

---

[1]   The Benincasas instituted separate litigation against Antonello, Myslajek and Larkin Hoffman related to claims involving the Plan.

(Notice of Removal [Doc. No. 1].)  Plaintiffs assert the following claims against Lafayette Life: (1) common law breach of fiduciary duty; (2) statutory breach of fiduciary duty; (3) violation of Minnesota regulations pertaining to insurance; (4) fraud/intentional misrepresentation; (5) negligent misrepresentation; (6) unjust enrichment; (7) rescission; and (8) violation of Minnesota's Consumer Fraud Act.

As to Plaintiffs' breach of fiduciary duty claims, they allege that Lafayette Life and Antonello breached both common law and statutory fiduciary duties by (1) recommending that they participate in the Plan, even though the Plan was not suitable for their investment objectives and involved an excessive amount of insurance; and (2) misrepresenting the tax consequences of the Plan.  (First Am. Compl. ¶¶ 55-71.)

Defendant filed a Motion for Partial Summary Judgment ("First Partial Summary Judgment Motion" [Doc. No. 54]) in April 2011, arguing that there is no genuine issue as to any material fact with respect to nearly all of Plaintiffs' claims, save for the portion of their breach of fiduciary duty claim based on the suitability of investment in the Plan.  Specifically, in its First Partial Summary Judgment Motion, Defendant argues the following: (1)  that Plaintiffs released Lafayette Life from any and all liability for taxes resulting from their participation in the Plan; (2) that Michael Antonello was not Lafayette Life's agent, therefore claims premised upon a theory of vicarious liability must fail; (3) that Plaintiffs' fraud claims must fail because there is no evidence that Defendant or Antonello knew or should have known that Antonello's statements were false and that Plaintiffs did not rely on any "actionable" representations by Antonello; (4) that the consumer fraud claim fails because Plaintiffs cannot demonstrate a benefit to the public; (5) that Minnesota rules regarding insurance regulation do not permit a private

cause of action; and (6) that Plaintiffs' rescission claim fails, as they continued to perform under the contract.

In September 2011, after the August 2011 close of all discovery, Defendant moved for Partial Summary Judgment ("Defendants' Second Partial Summary Judgment Motion" [Doc. No. 74]), on the remaining claim not encompassed by the First Partial Summary Judgment Motion, i.e., the portion of Plaintiffs' breach of fiduciary duty claims based on suitability.  In the Second Partial Summary Judgment Motion, Lafayette Life argues that Plaintiffs fail to make out a prima facie case of breach of fiduciary duty, by failing to disclose or substantiate their damages.

## II.    DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank of Missouri, 92 F.3d 743, 747 (8th Cir. 1996).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.   All justifiable inferences are to be drawn in the non-movant's favor and the evidence of the non-movant is to be believed.  Id. at 255.

### A.    Release of Liability

Defendant contends that because all of Plaintiffs' tax-related claims concern the sale of

the Policies, the Plaintiffs' participation in the Plan, and the associated tax liabilities, these claims are barred by the terms of the Releases.  The claims in question are the tax-related portion of Plaintiffs' breach of fiduciary duty claims, the violation of Minnesota regulations pertaining to insurance, fraud/intentional misrepresentation, negligent misrepresentation, unjust enrichment, rescission and the violation of Minnesota's Consumer Fraud Act.  (First Am. Compl. ¶¶ 60-62, 69-71, 84, 86-89, 95, 99, 101-01 & 105.)

"A valid release is a defense to any action on a claim released."  Goldberger v. Kaplan, Strangis & Kaplan, P.A., 534 N.W.2d 734, 737 (Minn. Ct. App. 1995) (quoting Sorensen v. Coast-to-Coast Stores (Central Org.), Inc., 353 N.W.2d 666, 669 (Minn. Ct. App.1984), pet. for rev. denied (Minn. Nov. 7, 1984)).  In Goldberger, the court held that releases executed as part of a settlement agreement barred the plaintiffs' claims.  Id.; see also Barilla v. Clapshaw, 237 N.W.2d 830, 831 (Minn. 1976) (holding, "When the parties to a contract of release knowingly and voluntarily, with advice of counsel, agree to release all injuries, both known and unknown, they effectively assume the risk of mistake as to the nature and extent of the injuries.");  Sorensen, 353 N.W.2d at 669-70 (affirming summary judgment for defendant based on release). In deciding whether the terms of the release in Sorenson applied to the plaintiff's claims, the court considered the scope of the release and whether the parties' actual intent was to release claims.  353 N.W.2d at 669-70.  The court held that intent may be inferred from the language of the release, consultation with legal counsel, existence of fraud or misrepresentation, wrongful concealment of fact or inequitable conduct contributing to the plaintiff's mistake, or duress.  Id. While "the law presumes that parties to a release agreement intend what is expressed in a signed writing," the presence of these factors may demonstrate an absence of intent.  Id. at 670.

Here, the language of the Releases is unequivocal, extensive and repetitive:   Plaintiffs agreed to hold Lafayette Life harmless "as to any and all consequences of our participation in a [Welfare Benefit Trust] or [Voluntary Employees' Benefit Association], including but not limited to any tax consequences," and further agreed not to seek contribution or reimbursement from Defendant for any loss "directly or indirectly arising out of, or in any way related to the existence or administration of the [Welfare Benefit Trust] or [Voluntary Employees' Benefit Association], and its purchase of life insurance."  (Releases, Exs. A & B to Silverstein Decl.) (emphasis added).   Plaintiffs' tax-related claims concern their participation in the Plan and the resulting tax implications and consequences of that participation. Therefore, the terms of the Releases apply to the tax-related causes of action in this suit and Plaintiffs cannot avoid the effect of these disclaimers.

As to evidence showing a lack of Plaintiffs' intent to release such claims, Plaintiffs have produced no such evidence.  Rather, the Court has found that the language of the Releases is clear and uncomplicated.  Plaintiffs, who are savvy business professionals, were not only advised to consult with legal counsel and a tax advisor about participating in the Plan, but they did so. While evidence of fraud or misrepresentation might lead to nullification of a release, such evidence of "fraud or misrepresentation must touch execution of the release." Sorenson, 353 N.W.2d at 670 (citing Schmitt-Norton Ford, Inc. v. Ford Motor Co., 524 F.Supp. 1099, 1103 (D. Minn. 1981)). While  Plaintiffs argue that they were misled about the rate of return and tax implications of participation in the Plan, there is no evidence of fraud or misrepresentation related to the Releases nor do Plaintiffs claim to have been misled about the nature of the documents that they reviewed and signed.  The Court finds no evidence of wrongful concealment

or other inequitable conduct contributing to Plaintiffs' "mistake" in signing the Releases and no

evidence of duress.   Accordingly, in light of the language of the Releases, the Court finds there

is no genuine issue as to any material fact as to Plaintiffs' tax-related causes of action.

Defendant is therefore entitled to summary judgment on the tax-related portion of Plaintiffs'

breach of fiduciary duty claims, the violation of Minnesota regulations pertaining to insurance,

fraud/intentional misrepresentation, negligent misrepresentation, unjust enrichment, rescission,

and the violation of Minnesota's Consumer Fraud Act.

### B.     Vicarious Liability

Although the Court's finding regarding the Releases executed by Plaintiffs is dispositive

of nearly all of Plaintiffs' claims, the Court will nonetheless address the other grounds for

summary judgment advanced by Lafayette Life.  Lafayette Life argues that the Benincasas'

claims premised upon vicarious liability (i.e., failure to supervise, fraud, negligent

misrepresentation, unjust enrichment, violation of the Minnesota Consumer Fraud Act,

rescission and portions of the breach of fiduciary duty claims) fail as a matter of law.  Lafayette

Life maintains that Antonello was not its agent and was only provided limited authority to

perform certain tasks for Lafayette Life.  Therefore, Defendant contends it cannot be held liable

for his actions based on theories of vicarious liability.

Under Minnesota law, an agency relationship exists when a principal consents to

allowing an agent to act on its behalf and the agent is subject to the principal's control.  Frank v.

Winter, 528 N.W.2d 910, 914 (Minn. 1995).  The Minnesota Supreme Court has stated that

> [w]hile it is generally the rule that an insurance company is liable for the torts of
> its agents when they are acting within the scope of their employment, before that
> rule can be applied it is essential to determine whether the person claimed to be
> an agent was, in fact, acting in that capacity. A person who procures insurance for

others can be an insurance agent, an insurance broker, or both. The essence of the difference is that whereas an insurance agent acts on behalf of a particular insurance company, an insurance broker acts on behalf of the prospective insured.

Id. (citation omitted).

In dicta in a recent Minnesota Supreme Court decision, the court noted that this distinction between a broker and an agent may have been superseded by Minn. Stat. § 60K.49, subd. 1 (2010), which provides that "[a] person performing acts requiring a producer license under this chapter is at all times the agent of the insurer and not the insured." Graff v. Robert M. Swendra Agency, Inc., 800 N.W.2d 112, 118 (Minn. 2011). In an earlier decision that remains sound authority, however, the Minnesota Court of Appeals declined to apply similar language from the predecessor insurance statute, Minn. Stat. § 60K.15 (2000), to resolve the question of whether a seller of insurance functioned as a broker or agent. Berg v. Reimer, No. C6-01-485, 2001 WL 856443, *3 (Minn. Ct. App. July 31, 2001). The court found that Minn. Stat. § 60K.15 was a licensing statute and was not applicable to the determination of the existence of an agency relationship. Id. at *4. Instead, based on the terms of the contractual agreement between insurer and seller, the court concluded that the insurer was not liable for the actions of an insurance salesperson where the agreement between them "specifically provided that the insurance salesperson was not an employee of the insurer, and . . . placed limitations on the insurance salesperson's authority." Id.

Similarly, this Court finds that the terms of the Antonello/Lafayette Life agreement inform the resolution of this issue. Antonello was authorized to solicit applications for Lafayette Life annuities and life insurance, to service Lafayette Life policies, and to recruit, train and supervise employees of WMA who assisted in soliciting and servicing Lafayette Life products.

13

(Lafayette Life General Agent's Contract at 27, Ex. G to Silverstein Decl. [Doc. No. 81-1].)  To

the extent that Antonello provided the Benincasas with any tax or investment advice, such

actions were outside the scope of authority granted by Lafayette Life.  Moreover, the Benincasas

acknowledged the limited scope of Antonello's authority by signing the Plan's Disclosure and

Acknowledgment Statement, which provided:

> No director, officer, employee, agent, General Agent, or other person has authority on behalf of [Lafayette Life] to provide the Plan, [MUI], or any of [MUI's] employees with any legal or tax advice concerning participation in the Plan, or the termination of participation in the Plan.
>
> ***
>
> 3.  Neither [Lafayette Life] nor any of its directors, officers, employees, agents, General Agents or other representatives have offered or have the authority to offer any legal or tax advice concerning the adoption and/or participation in the [419] Plan. The Plan Sponsor, Administrator, Trustee, and [Lafayette Life] cannot and have not guaranteed or promised any particular legal or tax consequences from [MUI's] adoption or participation in the [419] Plan.

(Disclosure & Acknowledgment Stmt., Ex. E to First Lindell Decl.)  In addition, Plaintiffs

acknowledged that Lafayette Life made no representations concerning the following: (1) whether

or not MUI would be allowed a current income tax deduction for amounts contributed to the

Plan; (2) whether or not an income tax deduction allowed in any taxable year might again be

allowed in any subsequent taxable year for any reason; (3) whether MUI would recognize any

income or gain from participation in the Plan or from the termination of participation in the Plan;

and (4) whether any transaction might constitute a reversion of Plan assets to the Employer.  (Id.)

    Antonello was also considered an independent contractor under the terms of the

Antonello/Lafayette Life contract.   (Lafayette Life Corporate General Agent's Contract ¶ 4, Ex.

G to Silverstein Decl.)  Lafayette Life exercised "no direction or control over [his] time or

physical activities." (Id.)  Moreover, he sold insurance and securities for a variety of companies in addition to Lafayette Life,  including American Mutual Life, Jefferson Pilot Securities Corporation, Prudential Securities, Inc., and SII Investments, Inc.  (Decl. of Michael Antonello ¶ 3.)  James Benincasa testified that he heard the name "Lafayette Life" only after Plaintiffs had decided to participate in the Plan.  (James Benincasa Dep. at 214-15, Ex. B to First Lindell Decl.)

The Court finds that the contract between Antonello and Lafayette Life limited Antonello's authority to act on Lafayette Life's behalf in several ways.  Additionally, Plaintiffs acknowledged that Antonello was not authorized by Defendant to provide tax or investment advice, or to endorse the Plan.  See Braham v. Mut. Life Ins. Co. of N.Y., 73 F.2d 391, 394 (8th Cir. 1934) ("These restrictions on the power of the agent, being contained in the application signed, were notice to the applicant of the lack of authority of the soliciting agent to make any contract of insurance except as authorized by the provisions of the application itself.")  Under these circumstances, the Court concludes that Antonello was not an agent of Defendant and Defendant is entitled to summary judgment on Plaintiffs' vicarious liability claims for breach of fiduciary duty, failure to supervise, fraud, negligent misrepresentation, unjust enrichment, rescission and violation of the Minnesota Consumer Fraud Act.

### C.    Fraud Claims

Plaintiffs assert claims for fraud based on intentional and negligent misrepresentation. (First Am. Compl. Counts IV & V, ¶¶ 85-95.)  Essentially, the facts giving rise to these claims are that Defendant, through Antonello, allegedly made fraudulent or negligent misrepresentations concerning: (1) the future performance of the Policies; (2) the tax treatment

of MUI's funding of the Policies and any withdrawals made from the Policies; and (3) the

suitability of the Policies  for Plaintiffs.

> To establish a claim for fraud, the plaintiff must establish the following elements:
>
> (1) a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer[ed] pecuniary damage as a result of the reliance.

Hoyt Props., Inc. v. Prod. Res. Group, LLC, 736 N.W.2d 313, 318 (Minn. 2007) (citing

Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn.1986)).   Similarly, with respect

to negligent misrepresentation, a plaintiff must establish that the defendant provided false

information in connection with a business transaction, that the plaintiff reasonably relied on the

information and that the defendant failed to exercise reasonable care or competence in conveying

the information.  Greuling v. Wells Fargo Home Mortg., Inc., 690 N.W.2d 757, 760 (Minn. Ct.

App. 2001).

> Plaintiffs, however, have not presented evidence establishing that Defendant or Antonello

knew, or should have known, that any representation made by Antonello was false when made,

or that any person was negligent in obtaining or communicating material information.  This

remains consistent with this Court's earlier ruling denying Plaintiffs' motion to amend for

punitive damages, in which the Court held that the Benincasas "failed to present evidence that

Defendant (or Defendant's agents) knew anything represented to Plaintiffs was a

misrepresentation."  (Order of 5/4/11 at 6 [Doc. No. 73].)  Where a plaintiff fails to present

evidence of a defendant's knowledge of the falsity of a statement, courts may grant summary

judgment to the defendant.  See Taylor Inv. Corp. v. Weil, 169 F. Supp.2d 1046, 1064 (D. Minn.

2001); Kladivo v. Sportsstuff, Inc., 06-CV-4924 (JRT/RLE), 2008 WL 4933951, at *5 (D. Minn. Sept. 2, 2008).

In addition to the failure to present evidence of Defendant's knowledge of the falsity of Antonello's statements, Plaintiffs have not demonstrated that they relied on any such statements. Reasonable reliance is a necessary element of fraud or negligent misrepresentation. Flynn v. Am. Home Prods. Corp., 627 N.W. 2d 342, 349 (Minn. Ct. App. 2001). However, "[w]hen a party conducts an independent factual investigation before it enters into a commercial transaction, that party cannot later claim that it reasonably relied on the alleged misrepresentation." Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009) (finding that defendant's fraudulent misrepresentation counterclaim failed where the parties were sophisticated business equals operating in a commercial setting, and the defendant conducted an investigation and experimentation regarding the quality and application of the product at issue); see also Mercy Fin. Group, LLC v. George A. Hormell II Trust, Nos. A08-2076, A09-0276, 2009 WL 4040452, at *11 (Minn. Ct. App. Nov. 24, 2009) (finding that "because Mercy conducted an independent investigation and acted upon the results thereof without regard to the alleged misrepresentations, it cannot maintain its cause of action.") Here, the Benincasas, sophisticated business owners, consulted with their legal counsel at Larkin Hoffmann and their tax consultant, Myslajek, regarding participation in the Plan and its tax consequences. Because it cannot be said that Plaintiffs relied on any statements made by Antonello, Plaintiffs' fraud and misrepresentation claims fail for this reason as well.

In addition, statements which constitute mere predictions or opinion cannot form the basis of a fraud claim, as an actionable misrepresentation must relate to a past or present fact.

See Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386, 1392-93 (8th Cir.

1997) (observing that broken promises do not constitute fraud unless it is established that the

promisor had no intention of performing); Liimatta v. V & H Truck, Inc., No. 03-CV-5112

(JNE/RLE), 2005 WL 2105497, at *4 (D. Minn. Aug. 30, 2005) ("A fraud claim cannot be based

on predictions, opinions, or sales puffery.")   In Parkhill v. Minn. Mut. Life Ins. Co., 174 F.

Supp.2d 951, 960 (D. Minn. 2000), this Court held that husband and wife life insurance

policyholders could not have reasonably relied on their insurance agent's alleged

misrepresentations, because "neither the policy nor the written materials associated with the

policies provide a guarantee that the policies will sustain themselves.  Indeed, these written

documents expressly state that dividends cannot be guaranteed."

Here, Defendant is correct that the alleged "promises" giving rise to Plaintiffs' claims are

contradicted and disclaimed by the policy language.  Also, Plaintiffs have not demonstrated that

Lafayette Life had no intention of performing.    The express language of the Policies'

disclaimers and disclosures negates any possible reliance regarding the tax implications of the

Plan and whether the Benincasas would realize any income or gain from participation in the

Plan.  (Disclosure & Acknowledgment Stmt., Ex. E to First Lindell Decl.)   For all of these

reasons, there is no genuine issue as to any material fact regarding Plaintiffs' fraud and

misrepresentation claims, and Defendant is entitled to summary judgment.

### D.   Consumer Fraud

Plaintiffs assert a claim pursuant to the Minnesota Consumer Fraud Act ("CFA"), Minn.

Stat. § 325F.69.   This statute, however, does not provide for a private cause of action. See

Wehner v. Linvatech Corp., No. 06–CV–1709 (JMR/FLN), 2008 WL 495525, at *3 (D. Minn.

18

Feb. 20, 2008).   Under Minnesota's Private Attorney Statute ("Private AG Statute"), however,

"any person injured by a violation" of the laws entrusted to the Minnesota Attorney General to

investigate and enforce – including the CFA – may file suit and recover damages as well as costs

and attorney fees.   Minn. Stat. § 8.31, subd. 3a.   By providing an incentive to encourage

defrauded consumers to file suit, the Private AG Statute "advances the legislature's intent to

prevent fraudulent representations and deceptive practices with regard to consumer products . . .

."   Ly v. Nystrom, 615 N.W.2d 302, 311 (Minn. 2000).   Because the Private AG Statute grants

private citizens the right to act as a 'private' attorney general, the limits of a private claim under

the statute are defined by the role and duties of the attorney general with respect to enforcing the

fraudulent business practices at issue.   Id. at 313.   Because the attorney general is not

responsible for protecting "private or individual interests independent of a public purpose," the

Minnesota Supreme Court concluded in Ly that "the Private AG Statute applies only to those

claimants who demonstrate that their cause of action benefits the public."   Id. at 314.   Therefore,

Plaintiffs must show a public benefit in order to bring claims under any Minnesota law that does

not provide an independent private right of action but is covered by the Private AG Statute.   See,

e.g., Davis v. U.S. Bancorp, 02-CV-505 (PAM/RLE), 2003 WL 21730102, at *4 (D. Minn. July

23, 2003) (granting summary judgment to defendant on claims "for personal benefit only" based

on the CFA and other state statutes), aff'd, 383 F.3d 761 (8th Cir. 2004).

"To determine whether a lawsuit is brought for the public benefit, the Court must

examine not only the form of the alleged misrepresentation, but also the relief sought by the

plaintiff." Zutz v. Case Corp., 02-CV-1776 (PAM/RLE), 2003 WL 22848943, at *4 (D. Minn.

Nov. 21, 2003). Courts focus their inquiry on the relief sought by the plaintiff and the form of the

alleged misrepresentation.  In re Levaquin Prods. Liab. Litig., 752 F. Supp.2d 1071, 1076-77 (D. Minn. 2010).   Here, Plaintiffs seek monetary damages and/or rescission based on alleged misrepresentations from their one-one-one interactions with Antonello.  Plaintiffs do not allege that Antonello's alleged statements were disseminated to anyone other than themselves.  Accordingly, the public is not implicated in this claim and it fails as a matter of law.

### E.    Minnesota Rules Regulating Insurance

Plaintiffs assert a claim against Lafayette Life pursuant to Minn. Adm. R. 2795.0800, alleging that Defendant failed to properly supervise its agent.  As previously discussed, this claim is unavailing, as the Court has determined that Antonello was not an "agent" of Lafayette Life.  In addition, violations of Chapter 2795 of the Minnesota Rules only subject the violator to the penalties prescribed in Minn. Stat. §§ 72A.22-72A.29, the Unfair Claims Practices Act ("UCPA").  Minn. Adm. R. 2795.1900.  The UCPA, however, "provides for administrative enforcement and does not create a private cause of action."  Glass Serv. Co., Inc. v. Progressive Specialty Ins. Co., 603 N.W.2d 849, 852 n.2 (Minn. Ct. App. 2002).  Plaintiffs cannot maintain a private action pursuant to Minnesota's administrative rules governing the sale of insurance and this claim fails as matter of law.

### F.    Rescission

Plaintiffs also assert a cause of action for rescission, seeking to recover the $2.8 million in premiums paid for the Policies, along with prejudgment interest, taxes, tax-related penalties and interest assessed for unlawful deductions that MUI recorded on its tax returns.  (First Am. Compl. ¶¶ 100-103.)

Rescission is an equitable remedy and "a court may order an agreement rescinded if both

parties were mistaken with respect to facts material to the agreement." <u>SCI Minnesota Funeral Services, Inc. v. Washburn-McReavy Funeral Corp.</u>, 795 N.W.2d 855, 861 (Minn. 2011) (quoting <u>Gartner v. Eikill</u>, 319 N.W.2d 397, 398 (Minn.1982)).   "The general rule is that a party who wishes to rescind an agreement must place the opposite party in status quo." <u>Liebsch v. Abbott</u>, 122 N.W.2d 578, 581 (Minn.1963).   Under Minnesota law, a party wishing to rescind a contract "must act promptly" and the right to rescind may be waived by "continuing to treat the contract as a subsisting obligation." <u>Cut Price Super Mkts. v. Kingpin Foods, Inc.</u>, 98 N.W.2d 257, 267 (Minn. 1959).   Here, there is no evidence that both parties were mistaken about the facts material to the agreement.   While the parties' expectations may not have ultimately been fulfilled, there is no showing of mistake with respect to the material facts of the Policies. Moreover, Plaintiffs have accepted and retained the arguable benefits of the policies.   Defendant proffers evidence that Plaintiffs have utilized the "cash value" of the Policies by taking partial cash surrenders totaling $1.35 million.   (Cash Surrender Stmts., Ex. H to Silverstein Decl.) Accordingly, for these reasons, Plaintiffs' claim for rescission fails as a matter of law and Defendant is entitled to summary judgment.

### G.      Breach of Fiduciary Duty Claim Re: Unsuitability

Defendant's Second Motion for Partial Summary Judgment seeks judgment as to the

portion of Plaintiffs' breach of fiduciary duty claims based on the suitability of the Plan.   Under

this theory of liability, Plaintiffs contend that Lafayette life owed them a fiduciary duty to issue

suitable life insurance policies, that Lafayette Life breached that duty and that Plaintiffs have

sustained damages as a result.

As previously discussed, a claim for fraud requires proving the element of damages,

Hoyt, 736 N.W.2d at 318, and damages are likewise an element in a claim for breach of fiduciary

duty.  Conwed Corp. v. Emp'rs Reinsurance Corp., 816 F. Supp. 1360, 1362 n.3 (D. Minn.

1993); Storage Tech. Corp. v. Cisco Sys., Inc., 00-CV-2253 (JNE/JGL), 2003 WL 22231544, at

*10 (D. Minn. Sept. 25, 2003)).  Plaintiffs provided a handwritten damages computation attached

to their Amended Rule 26(a)(1)(A) Report, calculating "Rescission Damages as of August 31,

2010," the related pre-judgment interest, and a calculation of an award of attorney's fees.  (Pls.'

R. 26(a)(1)(A)(i) Report at 5, Ex. L to Second Lindell Decl.)  The damages calculation, however,

apparently for rescission damages only, contains no provision for unsuitability damages, nor

were Plaintiffs' experts retained to opine on this subject.  (Danielson Dep. at 78-79, Ex. M to

Second Lindell Decl.; Lebewitz Dep. at 12-16, Ex. N to Second Lindell Decl.)   As noted herein,

rescission is an equitable remedy by which the parties attempt to be restored to their respective

positions.  Liebsch, 122 N.W.2d at 581.  "'[W]e are not concerned in an action for rescission

with a question of damages.'" Gary v. Conrad, C7-97-1784 & C0-98-177, 1998 WL 404951, *1

(Minn. Ct. App. July 21, 1998) (quoting Spiess v. Brandt, 41 N.W.2d 561, 568 (1950)).

In contrast, a party who successfully brings a breach of fiduciary duty claim may be

entitled to compensatory damages.  See Pedro v. Pedro, 463 N.W.2d 285, 288 (Minn. Ct. App. 1990) ("Whether damages may be awarded for breach of fiduciary duty must, in this case, be determined by a threshold question: was there a difference between the fair value of respondent's shares of stock in the company and the amount he would receive in a buyout under the [stock retirement agreement]?"); Shepherd of the Valley Lutheran Church of Hastings v. Hope Lutheran Church of Hastings, 626 N.W.2d 436, 444 (Minn. Ct. App. 2001) (affirming award of compensatory damages for breach of fiduciary duty); Minn. Stat. § 45.026, subd. 2 ("In an action for breach of fiduciary duty, a person may recover actual damages resulting from the breach, together with costs and disbursements.").

Plaintiffs' Amended Rule 26 Report does not purport to show the difference between the value of the Policies and the differential investment value, if any, that Plaintiffs would have earned through "suitable investments."  Other courts have found that the appropriate measure of damages for breach of fiduciary duty based on an allegedly unsuitable investment is the difference between the value of the plaintiff's current investment and the value of the plaintiff's investment had it been suitably invested.  See Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 461 (9th Cir. 1986) (noting proper measure of damages and reversing district court's exclusion of expert testimony on the present value of the plaintiff's stock); Cmty. Hosp. of Springfield & Clark Cnty., Inc. v. Kidder, Peabody & Co., Inc., 81 F. Supp.2d 863, 874 (S.D. Ohio 1999) (approving the plaintiffs' damage calculation, which was based upon the decline in the value of their portfolio compared to the profits they would have earned had their funds been properly invested); Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar, 274 F. Supp.2d 701, 705-09 (W.D. Pa. 2003) (affirming arbitration award in which damages for breach of fiduciary

duty were measured by difference between net proceeds of a stock sale if the stock had been sold at appropriate time and the actual proceeds of the mitigation sale).   This Court has dismissed cases for the plaintiff's failure to introduce evidence of damages.   Gauff v. Wimbley, 09-CV-3423 (MJD/JJG), 2011 WL 1363981 (D. Minn. Apr. 11, 2011.)   Here, Plaintiffs have failed to demonstrate unsuitability damages related to their claims of breach of fiduciary duty, for which rescission is not an available remedy, as it is not a measure of damages.   Because Plaintiffs have failed to establish a prima facie element of their breach of fiduciary claims, these claims fail as a matter of law.   Defendant is therefore entitled to summary judgment on the portion of Plaintiffs' fiduciary duty claims based on suitability.

For all of the reasons discussed herein, the Court concludes that there are no genuine issues of material fact and that Defendants are entitled to summary judgment on all of Plaintiffs' claims.   To the extent that Lafayette Life seeks attorney's fees and costs, the request is denied.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     Defendant's Motions for Partial Summary Judgment [Doc. Nos. 54 & 74] are

**GRANTED**; and

2.     Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   November 29, 2011

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge